**FILED**

APR 2 8 2008

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

)
**DF-VIMARC CORPORATION** )
**FORMERLY KNOWN** )
**AS DF CORPORATION** )
**4101 Cathedral Ave NW #703** )
**Washington, DC 20016** )          Case No. _____
)                **COMPLAINT**
)                **Jury Trial Demanded**
*Plaintiff,* )
)          Case: 1:08-cv-00725
*v.* )          Assigned To : Bates, John D.
)          Assign. Date : 4/28/2008
**WACHOVIA BANK, N.A.** )          Description: General Civil
**301 S. Collage Street,** )
**Charlotte, NC 28288** )
)
*Defendant.* )
)



## COMPLAINT

Plaintiff, DF-Vimarc Corporation, formerly known as DF Corporation, by

counsel, for its complaint against Wachovia Bank, N.A., alleges as follows:

### PARTIES

1. Plaintiff DF-Vimarc Corporation formerly known as DF Corporation ("DF-

Vimarc" or "Plaintiff") is a foreign business corporation organized under the laws of the

State of Delaware, with its principal place of business at 4101 Cathedral Ave NW #703,

Washington, DC 20016.

2. Defendant, Wachovia Bank, N.A. ("Wachovia", "Bank" or "Defendant") is a

banking institution chartered by the U.S. Office of the Comptroller of the Currency, with

its principal place of business located at 301 S. College Street, Charlotte, North Carolina

28288.

1

## JURISDICTION AND VENUE

3.  This Court has subject-matter jurisdiction over all claims asserted in this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and because there is complete diversity between the parties to this action, i.e., Plaintiff is a citizen of a different state than Defendant.

4.  This Court has personal jurisdiction over Defendant pursuant to D.C. Code § 13-423.

5.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Defendant transacts business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### Roy Gray's Employment at DF-Vimarc Corporation

6.  In September 2006, Hans Land ("Mr. Land"), the President of DF-Vimarc, on behalf of DF-Vimarc Corporation, hired Roy Gray ("Mr. Gray"), 72 years old, as a part-time bookkeeper.

7.  Prior to hiring Mr. Gray, Mr. Land investigated and researched Mr. Gray thoroughly.

8.  Mr. Gray's resume included a bachelor's degree in business administration, as well as a bachelor's and master's degree in accounting, and, throughout his lengthy career, he had held many responsible positions.

9.  Mr. Gray received superb recommendations and outstanding references. At least two institutional references stressed that Mr. Gray had resolved serious problems created by their previous bookkeepers.

2

10. Mr. Gray worked between eight and sixteen hours per week at Mr. Land's home office in the District of Columbia.

11. Mr. Gray's duties included keeping records of DF-Vimarc's corporate expenditures, and providing a weekly status report to Mr. Land.

12. As a result of his duties, Mr. Gray had access to DF-Vimarc's corporate checkbook and to its financial software program, QuickBooks, which he was to use.

13. Mr. Gray did not have signature authority for corporate checks at any time during his employment.

**The Fraudulent Activity**

14. In April 2005, DF-Vimarc opened a checking account at Wachovia ("DF-Vimarc Checking Account").

15. As part of opening the DF-Vimarc Checking Account. DF-Vimarc executed "Signature Cards" and presented a Certified Resolution of its Board of Directors, both of which represented the "authorized signatures" on the DF-Vimarc Checking Account. *See Deposit Agreement and Disclosures for Commercial Accounts* ("Deposit Agreement") attached hereto as Exhibit A.

16. Transactions related to the DF-Vimarc Checking Account could not be authorized unless they were presented with the "authorized signatures" that were represented on the "Signature Cards."

17. The Deposit Agreement which governed the DF-Vimarc Checking Account established a duty on the part of Wachovia to check the "authorized signatures" by expressly stating:

> The authorized signatures for an account are those reflected on the Signature Card, or on any resolution or other separate written

3

authorization relating to the account received by us. For the payment of funds and for other purposes relating to any account you have with us, we are authorized to recognize those signatures, but we will not be liable to you for refusing to honor a check or other signed instructions if we believe, in good faith, that the signature appearing on such checks or instructions is not genuine.

See Exhibit A at 4.

18. Neither the "Signature Cards" nor any resolution or other separate written authorization relating to the account authorized Mr. Gray to transact business through the DF-Vimarc Checking Account. Only Mr. Land and Mr. J. Stuart Lemle were authorized to draw checks on the DF-Vimarc Checking Account and only their signatures were given to Wachovia on the Signature Cards as well as on the Certified Resolution of DF-Vimarc's Board of Directors.

19. Beginning September 14, 2006 and continuing through May 25, 2007, Mr. Gray, without authorization, wrote and signed 44 DF-Vimarc Corporation checks ("Forged Checks") to himself or to an entity he owned, Bentley, Gray & Gray ("B.G.&G."), totaling $245,302.55.

20. Mr. Gray forged Mr. Land's signature on each of these checks.

21. Forty-two of the Forged Checks were honored by Wachovia Bank, where DF-Vimarc Corporation maintained its account, resulting in a total loss to DF-Vimarc Corporation of $231,122.55.

22. Wachovia failed to check the "authorized signatures" on the Forged Checks and failed to act in a commercially reasonable manner when processing the Forged Checks for payment.

23. A reasonable person would be able to easily detect the forgery. The signature on the majority of forged checks bears little resemblance to Mr. Land's signature.

4

24. Mr. Gray concealed his unauthorized activity from Mr. Land through multiple deceptions and manipulation of DF-Vimarc's books and records.

25. Contrary to the Deposit Agreement, Wachovia did not send monthly account statements to DF-Vimarc. This was contrary to Mr. Land's experience with other accounts which he maintained with Wachovia and with other banks. Repeated requests to obtain monthly statements were met with assent to do so but never implemented.

**Discovery of the Fraudulent Activity by PNC Bank**

26. On information and belief, Mr. Gray's fraudulent activity was discovered not by Wachovia, but by PNC Bank, where Mr. Gray and B.G. & G. maintained accounts.

27. On information and belief, PNC Bank had become suspicious of Mr. Gray's activities and notified Wachovia of the fraudulent activity.

28. According to the government's factual proffer, filed November 30, 2007, in Roy Gray's criminal case, *United States of America v. Roy Gray*, on July 9, 2007, Mr. Gray admitted in a videotaped statement that he had forged numerous checks from DF-Vimarc Corporation and had lost all of the stolen money gambling.

**Wachovia's Actions**

29. After receiving notice of the fraudulent activity, Wachovia's Loss Management Department opened an investigation, case number 13099212, and confirmed that the Bank had allowed Mr. Gray to draw $231,842.55 in fraudulent checks on DF-Vimarc's account.

30. On or about May 27, 2007, Jennifer Barnhill, an investigator with Wachovia's Loss Management Department, telephoned Mr. Land and informed him that Mr. Gray had written numerous checks to himself or his entity, forging Mr. Land's signature. Ms.

5

Barnhill stated that it was Wachovia's policy to reimburse "the last two months of fraudulent activity."

31. By letter dated October 19, 2007, Mr. Lemle wrote, among other things, the "...DC law requires that [Wachovia] reimburse DF-Vimarc in full for its losses of $231,842.55..." for the Forged Checks.

32. On July 19, 2007, Ms. Barnhill wrote a letter on behalf of Wachovia to Mr. Land, denying any reimbursement for DF-Vimarc's losses because DF-Vimarc allegedly failed to comply with the Deposit Agreement, which requires notice to the Bank of fraudulent activity within "a reasonable time, not to exceed thirty days" after receipt of an account statement reflecting fraudulent activity, notwithstanding the fact that Wachovia never provided Mr. Land with the required account statement or images of the cancelled Forged Checks.

33. As of the date of filing this Complaint, Wachovia has refused to reimburse Plaintiff for any of the Forged Checks.

**Count I**
**Liability for Violation of D.C. Code § 28:4-401(a)**

34. Plaintiff incorporates by reference paragraphs 1-33 as if fully alleged herein.

35. None of the charges to the DF-Vimarc Checking Account resulting from the Forged Checks or any service fees related thereto, were properly payable from the DF-Vimarc Checking Account, and Wachovia was not entitled to charge the DF-Vimarc Checking Account therefor.

36. Wachovia knew or should have known that none of the charges to the DF-Vimarc Checking Account resulting from the Forged Checks or any service fees related thereto

were properly payable from the DF-Vimarc Checking Account and that it was not entitled to charge the DF-Vimarc Checking Account therefor.

37. Wachovia unlawfully and without good faith charged DF-Vimarc's account for checks bearing a signature other than that of the Hans Land as the unauthorized signatures are wholly inoperative as the signature of Hans Land.

38. By accepting, executing upon and paying the Forged Checks, Wachovia failed to exercise ordinary care and reasonable commercial standards, which failure substantially contributed to DF-Vimarc loss.

39. Wachovia did not act in good faith when it accepted, executed upon and paid the Forged Checks and when it refused to re-credit or refund the aforesaid improper charges to the DF-Vimarc Checking Account and the owner of the account DF-Vimarc.

40. Wachovia's acceptance, execution upon and payment of the Forged Checks and its refusal to re-credit or refund the aforesaid improper charges to the DF-Vimarc Checking Account or to the owner of the funds DF-Vimarc, was grossly negligent and recklessly indifferent to the rights of DF-Vimarc.

41. None of the amounts charged resulting from the fraudulent checks were properly payable from DF-Vimarc's account.

42. Wachovia actions were in violation of D.C. Code § 28:4-401(a). Wachovia is strictly liable for paying the checks bearing forged signatures.

Wherefore, Plaintiff DF-Vimarc, respectfully prays that this Court enter judgment against Defendant Wachovia Bank, N.A. in the amount $231,122.55 with respect to the Forged Checks plus fees and service charges assessed by Wachovia Bank, such other amount as may be shown by the evidence, plus pre-judgment and post-judgment interest,

attorneys' fees and costs to the extent recoverable and such other relief as this Court deems just and proper.

## Count II
### Negligence

43. Plaintiff incorporates by reference paragraphs 1-42 as if fully alleged herein.

44. Wachovia owed a duty to Plaintiff to exercise reasonable care in the handling of the funds in the DF-Vimarc Checking Account and to comply with reasonable commercial standards in the conduct of its business affairs and to comply with its contractual obligations to DF-Vimarc.

45. Wachovia owed a duty to its depositor, DF-Vimarc, to notify it of suspicious activity with respect to the DF-Vimarc Checking Account, including but not limited to an obligation to notify it of forgeries and any unusual pattern of checks drawn upon the DF-Vimarc Checking Account.

46. Wachovia's acceptance of the Forged Checks and other actions taken with respect to the DF-Vimarc Checking Account as more fully set forth above, constituted a breach of its duty of care to DF-Vimarc.

47. DF-Vimarc has been damaged by Wachovia's breach.

48. Wachovia's breach of duty was grossly negligent and recklessly indifferent to the rights of DF-Vimarc.

Wherefore, Plaintiff DF-Vimarc, respectfully prays that this Court enter judgment against Defendant Wachovia Bank, N.A. in the amount of his actual damages $231,122.55 or such other amount as may be shown by the evidence, plus pre-judgment and post-judgment interest, attorneys' fees and costs to the extent recoverable and such other relief as this Court deems just and proper.

8

## Count III
## Breach of Contract

49. Plaintiff incorporates by reference paragraphs 1-48 as if fully alleged herein.

50. Pursuant to the Deposit Agreement, Wachovia and DF-Vimarc contracted that Wachovia would hold the deposited monies in the DF-Vimarc Checking Account, and would pay out the monies only upon proper order of the authorized signatories to the DF-Vimarc Checking Account.

51. In violation of its contract with DF-Vimarc, Wachovia's acceptance of the Forged Checks and other actions taken with respect to the DF-Vimarc Checking Account as more fully set forth above, constituted a breach of the agreement governing the DF-Vimarc Checking Account.

52. DF-Vimarc has been damaged by Wachovia's breach.

53. Wachovia's breach of contract was grossly negligent and recklessly indifferent to the rights of DF-Vimarc.

Wherefore, Plaintiff DF-Vimarc, respectfully prays that this Court enter judgment against Defendant Wachovia Bank, N.A. in the amount of his actual damages $231,122.55 or such other amount as may be shown by the evidence, plus pre-judgment and post-judgment interest, attorneys' fees and costs to the extent recoverable and such other relief as this Court deems just and proper.

## Count IV
## Violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 *et seq*

54. Plaintiff incorporates by reference paragraphs 1-53 as if fully alleged herein.

9

55. The allegations of paragraphs 1-53 above are incorporated additionally and cumulatively as violations of the D.C. Consumer Protections Procedures Act ("CPPA").

56. Plaintiff is a consumer under the terms of the CPPA.

57. Wachovia is a merchant connected with the supply side of a consumer transaction under the terms of the CPPA.

58. Wachovia's actions constitute unlawful and unfair practices within the meaning of the CPPA. Such unlawful and unfair practices include, but are not limited to, Wachovia's representations to DF-Vimarc that it would provide services to him by properly managing and handling the DF-Vimarc Checking Account, upon which representations DF-Vimarc reasonably relied, and which services were not provided as represented.

59. As a direct and proximate result of Wachovia's unlawful and unfair practices, Plaintiff was damaged in an amount of at least $231,122.55.

60. Wachovia's violations of the CPPA were grossly negligent and recklessly indifferent to the rights of DF-Vimarc and justify the imposition of treble damages.

Wherefore, Plaintiff DF-Vimarc, respectfully prays that this Court enter judgment against Defendant Wachovia Bank, N.A. in the amount of $1,500 per violation of CPPA, or treble the amount of $231,122.55 or such other amount as may be shown by the evidence, plus pre-judgment and post-judgment interest, attorneys' fees and costs to the extent recoverable and such other relief as this Court deems just and proper.

## COUNT V
## Breach of Fiduciary Duty

61. Plaintiff incorporates by reference paragraphs 1-60 as if fully alleged herein.

62. DF-Vimarc placed complete trust and confidence in Wachovia because Wachovia agreed to hold the deposited monies in the DF-Vimarc Checking Account, and to pay out the monies only upon proper order of the authorized signatories to the DF-Vimarc Checking Account.

63. The representations and promises of Wachovia to DF-Vimarc, Wachovia's superior knowledge and expertise in the banking industry, the fact that Wachovia held itself out as a trusted banking institution and DF-Vimarc's foreseeable and reasonable reliance on Wachovia, gave rise to a fiduciary relationship between Wachovia and to DF-Vimarc.

64. As part of its fiduciary duties to DF-Vimarc, Wachovia owed to DF-Vimarc common law duties of care, loyalty, candor, disclosure and good faith and fair dealing.

65. In violation of its fiduciary duties, Wachovia's acceptance of the Forged Checks and other actions taken with respect to the DF-Vimarc Checking Account as more fully set forth above, constituted a breach of its fiduciary duty to DF-Vimarc.

66. DF-Vimarc has been damaged by Wachovia's breach.

67. Wachovia's breach of fiduciary duty was grossly negligent and recklessly indifferent to the rights of DF-Vimarc.

Wherefore, Plaintiff DF-Vimarc, respectfully prays that this Court enter judgment against Defendant Wachovia Bank, N.A. in the amount of his actual damages $231,122.55 or such other amount as may be shown by the evidence, plus pre-judgment and post-judgment interest, attorneys' fees and costs to the extent recoverable and such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Respectfully Submitted,

Marc E. Miller, DC Bar # 948372
Richard T. Rossier, DC Bar # 364649
Alex Menendez, DC Bar # MD023814
McLeod, Watkinson & Miller
One Massachusetts Avenue, N.W., Suite 800
Washington, D.C. 20001
(202) 842-2345

Attorneys for Plaintiff

# Exhibit A

# DEPOSIT AGREEMENT AND DISCLOSURES FOR COMMERCIAL ACCOUNTS

EFFECTIVE OCTOBER 28, 2004



**WACHOVIA**

08 0725

**FILED**

APR 2 8 2008

Clerk, U.S. District and
Bankruptcy Courts

No todos los documentos necesarios para abrir cuentas y darle mantenimiento a las mismas,
están disponibles en Español. Para asistencia en Español, por favor llame al 800-326-8977.

**INTRODUCTION**

Welcome to Wachovia. Thank you for banking with us. This Deposit Account Agreement ("Agreement") contains the following important sections:

**I. DEPOSIT ACCOUNT AGREEMENT**

**II. SPECIAL TERMS AND CONDITIONS FOR WIRE TRANSFERS**

**III. SPECIAL TERMS AND CONDITIONS FOR AUTOMATED CLEARING HOUSE (ACH) TRANSACTIONS**

Please **READ** and **RETAIN** this Agreement so that you can refer to it whenever you have a question about your account. If you have any questions after reading this Agreement, we will be happy to answer them. You may obtain an additional copy at any Wachovia Financial Center or by calling 800-222-3862.

**TABLE OF CONTENTS**

I. Deposit Account Agreement ...................................... 3
1. Legal Effect of Agreement ................................. 3
2. Scope of Agreement ........................................ 3
3. Deposits .................................................. 3
4. Collection of Items ....................................... 3
5. Payment of Checks and Other Withdrawals ........... 3
6. Authorized Signatures ..................................... 4
7. Facsimile Signatures ...................................... 4
8. Insufficient Funds/Overdrafts ............................ 4
9. Overdraft Checking Protection ............................ 4
10. Service Fees ............................................. 4
11. Automated Processing of Items ........................... 5
12. Fraud Detection/Deterrence and Safeguarding
    Your Account ............................................ 5
13. Statements .............................................. 5
14. Review of Account Statements ............................ 5
15. Stop Payment ............................................ 6
16. Setoff and Security Interest ............................ 6
17. Notices ................................................. 6
18. Closing your Account .................................... 6
19. Reporting Information ................................... 6
20. Abandoned Accounts ...................................... 7
21. Placement of Endorsements ............................... 7
22. Stale, Time-Dated and Post-Dated Items .............. 7
23. Night Depository Services ............................... 7
24. Courier Bag Retrieval and Delivery ...................... 8
25. Treasury Services ....................................... 8
26. Time Deposits ........................................... 8
27. Interest Information .................................... 9
28. Commercial Money Market Accounts ................... 9
29. Internal Money Management Accounting ............. 9
30. Policy for Payment of Interest on Collected
    Balances ............................................... 10
31. Business Savings Accounts ............................... 10
32. Interest-bearing Account Limitations ................ 10
33. Commercial Money Market Account
    Transaction Limitations ................................ 10
34. Business Savings Account Transaction
    Limitations ............................................ 10
35. Client Fund Manager .................................... 10
36. Transfer of Accounts/Assignment of
    Deposits ............................................... 10
37. Legal Process Affecting Accounts ....................... 10
38. Power of Attorney ...................................... 10
39. Other Adverse Claims ................................... 10
40. Conflicts/Disputes Involving the Account ............. 10
41. Changing This Agreement ................................ 10
42. Customer's Waiver of Notice ............................ 10
43. Waiver of Rights by the Bank ........................... 11
44. Invalidity of Contract Provisions ...................... 11
45. Force Majeure .......................................... 11
46. Applicable Law ......................................... 11
47. Arbitration of Disputes/Waiver of Jury Trial
    and Participation in Class Actions ..................... 11
48. Accuracy and Verification .............................. 11
49. Indemnification of Bank ................................ 11
50. Your Representations, Warranties and
    Covenants .............................................. 11
51. Signatures Received Via Facsimile (Fax) ............. 11
52. Entire Agreement ....................................... 11

II. Special Terms and Conditions For
Wire Transfers ............................................. 11
1. Authorization and Security Procedure ................. 11
2. Execution of Payment Orders ............................ 12
3. Cut-Off Times ........................................... 12
4. Advice of Funds Transfers ............................... 12
5. Limitation of Liability and Indemnification ............. 12
6. Use of Identifying Numbers ............................. 12
7. Interest Compensation .................................. 12
8. International Payments ................................. 12

III. Special Terms and Conditions For Automated
Clearing House transactions ............................... 12
1. Services ................................................ 12
2. Services Performed ..................................... 13
3. Rules and Verification of Entries ....................... 13
4. Office of Foreign Assets Control (OFAC) ............. 13
5. Pre-notification ........................................ 13
6. Cancellation, Amendment and
   Rejection of Entries ................................... 13
7. Retention of Information and
   Authorizations ......................................... 13
8. Inconsistency of Name and
   Account Number ......................................... 13
9. Security Procedures .................................... 13
10. Returned Entries ....................................... 13
11. On-Us Entries .......................................... 13
12. Provisional Payment .................................... 13
13. Collected Funds ........................................ 14
14. Authorization Warranty ................................. 14
15. Telephone-Initiated Entries ........................... 14
16. Internet-Initiated Entries ............................. 14
17. Your Liability ......................................... 14
18. Limitation of Liability and Indemnification ............ 14

**1.  LEGAL EFFECT OF AGREEMENT.** This agreement governs all commercial deposit accounts established with Wachovia Bank, National Association and supercedes any previous deposit agreement. The words "you," "your" and "yours" as used in this Agreement mean the person, partnership, corporation, association, limited liability company or other entity that maintains one or more deposit accounts with us including, but not limited, to all owners and signers on the account. The words "we," "us," "our," and "Bank" as used in this Agreement mean the Wachovia Bank in the state where we maintain your account. When you open, use and/or maintain an account with us, you are agreeing to the terms of this Agreement, including the fees and charges listed in the Schedule of Fees and Funds Availability for Commercial Accounts disclosure which is incorporated herein by reference. This Agreement, the Schedule of Fees and Funds Availability for Commercial Accounts and the Signature Card comprise our legally binding contract with you. For purposes of this Agreement, "Signature Card" refers to the Deposit Account Application or any other account opening documents that you completed when establishing your account. Our deposit relationship with you is that of debtor and creditor, and you agree that we are not in any way acting as a fiduciary for you or for your benefit. Depending on the context in which it is used, the term "item" means a check, draft or other written order or instruction for the payment of money or a point-of-sale authorization request, ATM withdrawal, ACH entry or other electronic transaction.

**2.  SCOPE OF AGREEMENT.** This Agreement only applies to business accounts. Business accounts are those accounts established by a partnership, corporation, association, limited liability company or other entity operated on a for-profit basis; a corporation or an association operated on a not-for-profit basis; a governmental unit; and an individual who intends to use the account for carrying on a trade or business (hereinafter collectively referred to as "business"). The classification and form of ownership of a business account are as designated on the Signature Card for an account and we may rely on those designations for all purposes relating to such account.

The business and each person who signs the Signature Card, any resolution or any other separate written authorization concerning an account, represents to and agrees with us that, (a) the business has taken all actions necessary to open and maintain the account, (b) all resolutions or other authorizations given to us by or on behalf of the business are true, accurate and complete in all respects, (c) all assumed or fictitious names used by the business have been duly registered or filed with the applicable governmental authorities, and (d) each person whose name is written or printed on the Signature Card, any resolution or any other separate written authorization concerning the account has complete authority to bind the business in all transactions involving any account.

The business agrees to notify us promptly in writing of any change in its form of organization or ownership or in the authority of any person with respect to the account or any transactions relating to it. We also reserve the right to require a partnership, corporation or other legal entity to give separate written authorization telling us who is authorized to act on its behalf. We may conclusively rely upon written instructions from the secretary or assistant secretary (or equivalent officers) of the business. We are authorized to follow the directions of a person designated as having authority to act on the entity's behalf until we receive written notice that the authority has been terminated and have had a reasonable time to act upon that notice.

**3.  DEPOSITS.** You may make deposits to your account in person at our financial centers, by mail or by any other method that we make available, such as at any Wachovia Automated Teller Machine (ATM) and at certain non-Wachovia ATMs. You are encouraged to use your personalized deposit slips in order to help us credit deposits to your account as soon as possible and to minimize errors. If you do not use your personalized deposit slips, you agree that we will not be liable to you for any errors resulting from your use of a counter deposit slip, whether completed by you or one of our employees. We are not responsible for deposits made by mail, night depository or other outside depository until we actually record the receipt of those deposits in our books and records. We have the right, but are not obligated, to endorse any items submitted for deposit to your account and to deposit them into your account and the right not to accept items that contain multiple, missing, or improper endorsements. We also have the right to limit, refuse, hold, or return any deposit. You agree that you shall not deposit, without our prior express written consent, unsigned demand drafts, any item in a check carrier, or any paper or electronic replacement for the original item, including without limitation substitute checks as defined by federal law that have not

been indorsed by a bank. You agree to be liable for and to reimburse us for any loss or expense or liability (including without limitation, attorneys' reasonable fees and costs of litigation) we may incur because you deposit any such items listed above, you fail to endorse an item exactly as drawn, you deposit an item with a missing endorsement, or resulting from or arising out of any return of or claim with respect to any deposited item for any reason whatsoever. You agree that we can automatically charge your deposit account for such losses and expenses without prior notice to you. If we receive an item on a weekend, holiday or after our "cut-off" hour on a business day, the item is deemed to have been received on our next business day. You agree that our count of the coins and currency in your deposit shall be conclusive as to the amount. We will make any necessary adjustments to your account for any discrepancies and notify you. Our business days and cut-off hours are posted at our financial centers and ATM cut-off hours are displayed on the ATM deposit screen and are subject to change from time to time at our discretion. We reserve the right to make adjustments to your account, in our sole discretion, for computation or other errors to your account.

**4.  COLLECTION OF ITEMS.** In receiving items for deposit or collection, we act as your collection agent and assume no responsibility beyond the exercise of ordinary care. Special instructions for handling an item are effective only if made in writing and given to us along with the item in question. We will not be liable for default or negligence of our correspondent banks or for loss in transit, and each correspondent bank will only be liable for its own negligence.

You are responsible for reconstruction and proof of loss of any items, including checks and other negotiable instruments, included in deposits that are lost or stolen in transit before we have received and accepted the deposit. Further, you agree to fully cooperate and assist in the reconstruction of any items, including checks and other negotiable instruments, included in deposits that are lost or stolen in transit after we have received and accepted the deposit. Items and their proceeds may be handled in accordance with applicable Federal Reserve regulations and operating circulars, Clearing House Association or Funds Transfer System rules, and contractual arrangements with other financial institutions. All deposited items (including those drawn on another account at the Bank) are credited subject to final payment and our receipt of cash proceeds. If you deposit foreign currency or items that are denominated in a foreign currency into your account, the final credit to your account will be based on the exchange rate in effect at the time we receive final payment for that item in United States currency. Without prior notice to you, we may charge back any item at any time before final payment, whether returned or not, and we may also charge back any item drawn on us if the item cannot be honored against the drawer's account. We are authorized to pursue collection of previously dishonored items, and in so doing may permit the payor bank to hold an item beyond the midnight deadline.

If any check or other item deposited in your account is returned to us by the bank on which it was drawn through the Federal Reserve, a clearing house or other normal check return channels, we may accept that return and charge the check or other item back against your account without regard to whether the bank on which the check was drawn returned the check before its midnight deadline. At our discretion, you authorize us to convert any of your checks that are returned for uncollected or insufficient funds to an electronic transaction. Furthermore, if, after a check or other item deposited into your account is finally paid, it is returned to us by the bank on which it was drawn because someone has made a claim that the check or other item was altered, forged, unauthorized, or should not have been paid for some other reason, we may debit your account for the amount of the item. If you have insufficient funds in your account to cover a returned item, we may overdraw your account in accordance with this Agreement in an amount equal to such check or other item. You agree to reimburse us for any costs or expenses we incur in connection with any such claim (including, without limitation, attorneys' reasonable fees and court costs) and agree that we may impose service fees against your account for processing any such claim as reflected in our Schedule of Fees and Funds Availability for Commercial Accounts from time to time.

**5.  PAYMENT OF CHECKS AND OTHER WITHDRAWALS.** Checks and other items are sometimes lost or truncated (i.e., converted into electronic images) during the collection process. Items that have been truncated may also be reconverted into substitute checks or other replacement documents. Under federal law, the Bank is required to accept substitute checks with warranties as the legal equivalent of the original and the Bank will pay and charge against your account such substitute checks. Moreover, you agree

that the Bank may at its discretion, rely on photocopies, image replacement documents, electronic checks or other paper or electronic replacements of the original item that do not constitute substitute checks, if they are legitimate replacements for properly drawn and authorized items. You agree to allow any imaged document or copy to serve as the original for all purposes, including charging your account or determining validity of signature, etc. We may refuse to pay or may impose a special fee for any check or other item drawn against your account or used to withdraw funds from your account if such item is not on a form we have approved. We also reserve the right to refuse to pay or impose a special fee for any check or other item drawn against your account or used to withdraw funds from your account if the transaction is made in a manner not specifically authorized for your account, if made more frequently or in a greater number than specifically permitted for your account, or if made in an amount less than the minimum withdrawal or transfer specifically permitted for your account. If you issue checks for payment with duplicate serial numbers, this will impair the bank's ability to protect your account; thus, you will have issued such checks at your own risk and we shall not be liable for such transactions. Withdrawals are generally made first from finally collected funds and, unless prohibited by law or by our Schedule of Fees and Funds Availability for Commercial Accounts policy, we have the right to refuse to pay any check or other item drawn against uncollected funds, impose a special fee for each such item, or both. We may pay checks or other items drawn upon your account (including those payable to us or on which we may be liable) in any order determined by us, even if (1) paying a particular check or item results in an insufficient balance in your account to pay one or more other checks or other items that otherwise could have been paid out of your account; or (2) using a particular order results in the payment of fewer checks or other items or the imposition of additional fees. Although we generally pay larger items first, we are not obligated to do so and, without prior notice to you, we may change the order in which we generally pay items.

From time to time, a person who is not our customer may attempt to cash a check that you have written on your account with us. Cashing an item for a non-customer exposes us to certain risks that are not present if the item is deposited at another financial institution and presented to us through the check collection system. As a result, you agree that we may charge a non-customer fee to cash an item (including a payroll check) that is drawn on your account with us unless prohibited by applicable law. You also agree that we may impose various additional identification, security and other requirements on a non-customer seeking to cash an item at one of our financial centers. These requirements may include, without limitation, submitting one or more forms of identification, providing thumbprints or other identifiers, and using specified teller lines that may only be available at specially designated locations. You agree that we will not be liable for wrongful dishonor for refusing to cash the item if the payee refuses or fails to pay the fee or comply with such reasonable security measures.

We reserve the right to limit the amount of funds that may be withdrawn from your account in cash for various reasons including, without limitation, the amount of currency that is available at a particular financial center. This limitation is in addition to those set forth in other sections of this Agreement.

**6. AUTHORIZED SIGNATURES.** The authorized signatures for an account are those reflected on the Signature Card, or on any resolution or other separate written authorization relating to the account received by us. For the payment of funds and for other purposes relating to any account you have with us, we are authorized to recognize those signatures, but we will not be liable to you for refusing to honor a check or other signed instructions if we believe, in good faith, that the signature appearing on such checks or instructions is not genuine. If the Signature Card is not returned, you agree that we will not be liable to you for honoring checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is authorized. When an account is established, you may indicate your desire for more than one authorized signature on a check or other item drawn against the account by designating a specific number of desired signatures on the Signature Card, a resolution or in a separate written authorization that is received by us. However, we do not offer accounts that require two or more signatures. Any such designation is solely for your convenience and internal control purposes and is not binding on us. As a result, you agree that we may pay checks against your account without regard to the number of desired signatures. You may also give another person authority over your account by your conduct or failure to act.

If you use a facsimile signature or endorsement, whether by machine, stamp or otherwise, that is not made by handwriting on any checks, drafts, notes, or other negotiable instruments with or without a designation of the party making such signature or endorsement, you agree that we may pay and charge your account for payments, checks, drafts, notes or other orders for payment bearing or purporting to bear the facsimile signature or endorsement of any person or persons required to sign, regardless of by whom or by what means the actual or purported facsimile signature or endorsement may have been affixed (whether or not authorized), and regardless of by whom or by what means the check, draft, note or other order for payment was created (whether or not authorized). We are not liable for any use of a facsimile signature or endorsement device. If you use a facsimile signature or endorsement, you bear the risk of any unauthorized use of your facsimile method or the use of fake facsimiles that may appear to be facsimiles.

**8. INSUFFICIENT FUNDS/OVERDRAFTS.** We may determine whether or not your account contains sufficient funds to pay a check or other item, authorize a point-of-sale transaction, or process any other electronic transaction at any time between the time we receive the check or other item, point-of-sale transaction authorization request, or other electronic transaction and our return deadline, and only one determination of the account balance is required. If our determination reveals insufficient available funds to pay the check or other item, authorize the point-of-sale transaction, or process the other electronic transaction you agree to pay us a service charge, and we are not required to honor the check or other item, authorize the point-of-sale transaction, or process the other electronic transaction and may return it, and/or decline it. Alternatively, we may honor the check or other item, authorize the point-of-sale transaction, or process the other electronic transaction and create an overdraft and impose a service charge for paying the overdraft. You agree to pay sufficient funds to cover the overdraft and the related service charge upon notice of the overdraft and to reimburse us for any costs we incur in collecting the overdraft from you including, without limitation, attorneys' reasonable fees and the costs of litigation to the extent permitted by law. However, the honoring of one or more overdrafts does not obligate us to honor any future overdrafts, and you should not rely on us to honor an overdraft even if we have done so in the past. Moreover, we are not required to send you prior notice on checks returned for insufficient funds.

**9. OVERDRAFT CHECKING PROTECTION.** If over-draft checking protection is available and you elect that option, we will automatically transfer funds, sufficient to cover the amount of any overdraft and service charge to your primary checking account from any other eligible secondary deposit account (checking, savings or money market) or credit account (commercial credit card or line of credit) you selected. One transfer will be made at the end of the business day in which an overdraft(s) occurs, as follows:

**A. Overdraft transfers made from a deposit account.**

Funds will be transferred in the next largest full dollar amount. You agree to pay an overdraft protection service charge for each daily transfer, as provided in the our Schedule of Fees and Funds Availability for Commercial Accounts, and that charge will be deducted from your primary account. This is not an extension of credit and no transfer will be made if sufficient funds are not available in your secondary account to cover the overdraft. If your secondary account is a savings or money market account, transfers from such accounts are pre-authorized transfers and, under federal regulation, you are not permitted to make more than six (6) pre-authorized transfers (including telephone transfers) each statement period.

**B. Overdraft transfers made from a credit account.**

Funds will be transferred in amounts rounded up to the next one hundred dollar ($100) increment, subject to your available credit limit. An overdraft transfer from a credit account is treated as a cash advance and is subject to the terms of the credit agreement, including any applicable transaction fee or other fees.

If there are not sufficient funds in your secondary deposit account to cover an overdraft in your primary checking account, no transfer will be made and you will be charged an insufficient funds fee in accordance with the Schedule of Fees and Funds Availability for Commercial Accounts. That fee will be deducted from your primary account.

**10. SERVICE FEES.** You agree to pay any service fees that apply to

your account or the Services described in this Agreement. Service fees may include, but are not limited to, charges for check printing, check writing, stop payment orders, notices of post-dated items, cashier's checks, overdrafts, Automated Clearing House (ACH) entries, wire transfers, insufficient funds checks, other items, point-of-sale transaction authorization requests and other electronic transactions, and treasury services and other depository services. Any fees may be deducted from your account without prior notice to you. We will not be liable for dishonoring checks or other withdrawal orders because of insufficient funds resulting from proper deduction of fees. Our current Schedule of Fees and Funds Availability for Commercial Accounts will be given to you when you open an account and is available at any of our financial centers. Service fees are subject to change from time to time at our discretion. Notice of any changes will be sent to you at the address shown on our records, and a reasonable period of time will be given before any changes become effective. You further agree to reimburse us for any actual expenses we incur to execute, cancel or amend any wire transfer payment order or ACH entry, or perform any related act at your request.

11. **AUTOMATED PROCESSING OF ITEMS.** Checks you write or deposit may be automatically processed and/or converted into electronic images (truncated) during the check collection and return process. If you elect to have your bank documents printed by a vendor that has not been approved by the Bank, or you use check stock or features (e.g., security features) that cause critical data on the check to disappear or be obscured upon truncation or you make your check out in such a way (e.g., using a lightly colored ink) that causes critical data to disappear upon truncation, you will be doing so at your own risk. We shall not be liable for processing errors or delays, losses or our failure to process any such item due to printing inaccuracies, faulty magnetic ink, encoding of critical data, or the failure of critical data printed or written on the item to survive truncation, or the use of check carriers. We have adopted automated collection and payment procedures so that we can process the greatest volume of items at the lowest possible cost to all customers. These automated procedures involve high-speed automated check processing machines that read information encoded onto each item in magnetic ink. In recognition of this fact, you agree that in paying or taking an item for collection, we may disregard all information on the item other than any information encoded onto the item in magnetic ink according to general banking standards, whether or not that information is consistent with other information on the item. For example, we may rely on the amount of a check as encoded in magnetic ink, even if that encoded amount is greater than the face amount of the check or exceeds the maximum amount for which the check is valid as stated in a legend on the check. You agree to reimburse us for any loss or expense (including without limitation, attorneys' reasonable fees and the cost of litigation) we incur because you issue or deposit an item (1) containing extra information such as, but not limited to, maximum amount limitations, date limitations, two signature requirements, etc.; (2) containing features or ink that cannot be properly imaged; or (3) placed in a check carrier. Furthermore, you agree that we have exercised ordinary care in paying an item even though our procedures do not provide for sight examination for alterations, verification of signatures or other aspects of items with a face amount below an amount we specify from time to time.

12. **FRAUD DETECTION/DETERRENCE AND SAFEGUARDING YOUR ACCOUNT.** There are several precautions that you can and should take to decrease the risk of unauthorized transactions from your account(s). Such precautions include, but are not limited to:

- Safeguarding and not disclosing to third parties information about your account, such as your account number(s);

- Safeguarding materials and information which can be used to access your account, including but not limited to, your checkbook, blank or unused checks, electronic access devices including ATM cards, personal identification numbers, and any passwords or other access-related information, to prevent them from being misused by an unauthorized party;

- Calling us immediately at 800-WACHOVIA (922-4684) if you suspect any problem with your account or unauthorized activity, or your checkbook or unused checks are lost, stolen or misplaced;

- Reviewing carefully your checkbook and unused checks for unauthorized activity if you suspect that any of these items may have been stolen or tampered with, or if you are the victim of theft or your property is burglarized;

- Promptly and carefully reviewing your statement each month for unauthorized activity or missing deposits;

- Closing your account immediately upon discovery of any known or suspected unauthorized activity. When you report missing, stolen, or unauthorized checks, we may recommend that any account(s) that has been compromised by unauthorized or fraudulent activity be closed. If you decline this recommendation and elect to leave your account open, we shall not be liable to you for subsequent losses on the account due to unauthorized activity and we may require you to indemnify us for any losses we incur as well;

- Limiting your telephone transactions with us to landline telephones. Cordless or cellular phone conversations can be intercepted without your knowledge or authorization;

- Maintaining close control over your facsimile signature devices to immediately detect any unauthorized use of those devices.

- Issuing any checks with care to avoid alterations or forgeries. Precautions include without limitation using a dark colored permanent ink to write out your checks, making sure the numeric and written amounts match and are readable, and making sure there are no blank or open spaces in the body of the instrument where words or figures are to be inserted.

In addition, from time to time we may make certain products and services that are designed to detect and/or deter check fraud available to you. While no product or service will be completely effective, we believe that the products and services we may offer will reduce the likelihood that certain types of fraudulent items will be paid against your account. You agree that if you fail to implement any of these products or services, or you fail to follow these and other precautions reasonable for your particular circumstances, you will be precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

13. **STATEMENTS.** Your statement will be mailed monthly, quarterly or annually, depending on the types of accounts and services you have with us, and will include the interest rate and effective yield for the interest payment(s) included in that statement. We will mail your statements to the address we have for you in our records, unless we have agreed to provide statements electronically. If you elect to have statements mailed to a third party address, you are still responsible for careful and prompt examination of the statement and the timely reporting of any problems or unauthorized transactions as outlined below. You agree to notify us if you change your address. You also agree that if the U.S. Postal Service or one of its agents notifies us of a change in address for you, we may change your address based on information provided to us by the U.S. Postal Service. We will have no liability to you for changing your address based on such information, even if the information provided by the U.S. Postal Service is in error. If any statement is returned to us because of an incorrect address, we may stop sending statements to you, but for all purposes it shall still be considered as if we made your statement of account available to you as of the statement date that was or would have been printed on your statement, showing payment of items and the items paid or the information sufficient to allow you to reasonably identify the items paid.

Your statement will be deemed to have been received by you five (5) calendar days after its date. You are responsible for notifying us promptly if you do not receive your statement(s). If you do not receive canceled checks or copies of canceled checks that you have elected to receive with your statement or you receive copies or substitute checks with an illegible image, the canceled checks or legible copies will be provided to you within a reasonable time after your written request that sufficiently identifies the checks requested. You agree to pay the applicable service charge for retrieving and copying the requested checks.

14. **REVIEW OF ACCOUNT STATEMENTS.** You are in the best position to discover a forged, unauthorized or missing signature or endorsement, a material alteration, a missing or diverted deposit, illegible image or any other error, or discrepancy relating to a check, deposit or other credit or debit entry to your account. Therefore, you agree to carefully and promptly examine your statements and canceled checks (if you have elected to receive them) when you, or a party designated by you, receive them. If you think that an unauthorized person has withdrawn funds from your account, that one or more deposits are not reflected on your statements, or that there is any other type of error or discrepancy in your statements,

you should notify us. Our statement shall be considered correct unless you notify us promptly after receipt of the statement, description of the canceled checks or the checks themselves, or after any error is discovered or reasonably could have been discovered, whichever occurs first.

If you do not discover and report a forged, unauthorized or missing signature, illegible image or an alteration promptly after we have sent or otherwise made your statements and/or canceled checks available to you, you agree not to assert against us (a) any forged, unauthorized or missing signature or alteration, if we suffered a loss because of your failure to discover and report the problem, and (b) any forged, unauthorized or missing signature or alteration by the same wrongdoer on items we paid after you have had a reasonable period of time (not to exceed 30 days) to examine the statement containing or reflecting the first forged, unauthorized or missing signature or alteration but before we received notice of the problem from you. If the previous sentence applies, but you are able to prove that we failed to exercise ordinary care in paying the item in question and that our failure substantially contributed to the loss, then the loss will be allocated between us based on the extent to which our respective failures to exercise ordinary care contributed to the loss. In that regard, and as disclosed elsewhere in this Agreement, we process checks and other items by automated means and do not visually examine or verify signatures on all checks or other items. You agree that we do not fail to exercise ordinary care because we use these automated procedures. You also agree that we do not fail to exercise ordinary care if the items were forged or altered so cleverly (as by unauthorized use of a facsimile machine, photocopy machine, computer equipment or otherwise) that a reasonable person would not detect the forgery or alteration.

If you have not discovered and reported a forged, unauthorized or missing signature or endorsement, a material alteration, a missing or diverted deposit, illegible image or any other error or discrepancy relating to a check, deposit or other credit or debit entry to your account within forty (40) days of the date on which the first statement containing or reflecting (or that should have contained or reflected) those items was mailed to you or otherwise made available to you, you agree not to assert that problem against us. This forty (40) day limitation takes priority over the provisions in the previous paragraph and applies regardless of whether or not you or we exercised ordinary care with respect to the item in question (or its payment), the examination of the statement on which it was reflected (or should have been reflected) or otherwise. IF YOU FAIL TO DISCOVER AND REPORT THESE OR ANY OTHER ERRORS OR DISCREPANCIES WITHIN THE FORTY (40) DAY PERIOD, YOU LOSE ANY AND ALL RIGHTS YOU MAY HAVE TO ASSERT THE ERROR OR DISCREPANCY AGAINST US.

15. **STOP PAYMENT.** You may ask us to stop payment on checks drawn on your account that we have not paid or certified. You must tell us the exact amount of the check, check number, date of check, payee and the full account number on which it is drawn for us to be able to enter a stop payment. If the information you give us is not correct or if you do not give us other reasonable information requested about the check, we will not be responsible if we are not able to affect the stop payment. We also cannot be responsible if we are not able to identify the proper check because you have issued more than one check with the same serial number. If you generate your checks by computer or in any other manner which does not produce a MICR-encoded check number on the check, we will be unable to guarantee that your stop payment will be honored. You therefore agree to hold us harmless should we be unable to honor a stop payment order which you have timely and correctly placed on your check with no MICR-encoded check number. We are entitled to a reasonable period of time within which to notify our employees after you give us a stop payment order. For purposes of this Agreement, a "reasonable time" means until the end of the business day following the day on which the stop payment order was placed. Moreover, we are not obligated to re-credit your account if we pay a check over a valid and timely stop order unless you are able to demonstrate that you would not have otherwise been obligated to pay the check. In that regard, you should be aware that a stop order does not relieve you of your obligation on a check that has been negotiated to a holder in due course. If we re-credit your account after paying a check over a valid and timely stop payment order, you agree to transfer to us all of your rights against the payee or other holder of the check, and to assist us in any legal action taken against that person later on. Any person who is authorized to draw checks against the account may give a release or cancellation of a stop payment order. Stop payment orders on official checks, cashier's checks, or money orders are not permitted. If an official check, cashier's check, or similar item has

been lost, stolen or destroyed, you may provide a declaration of loss and affidavit and request the check be re-issued. The Bank may require that you wait ninety (90) days (or provide a bond where permitted by law) before honoring your claim, and we will not be liable to you if such check is cashed prior to expiration of the ninety (90) days (or receipt of bond, if applicable). Stop payment orders (both oral and written) are valid for six (6) months unless you designate a longer period of time when placing the stop payment order. The fee for stopping payment is contained in the Schedule of Fees. You may extend a stop payment order by calling or writing us prior to the expiration of the existing stop payment order. An additional fee may apply for the extended period. If you place a stop payment order, you agree to pay our stop payment fee and to hold us harmless from costs and expenses incurred by us, including our attorneys' reasonable fees, in connection with our refusal to pay the stopped check . We will not be liable to you for any indirect or consequential damages.

16. **SETOFF AND SECURITY INTEREST.** Any pledge or assignment of CDs and other accounts for security purposes remains subject to our right of setoff and security interest. If you ever owe us money as a borrower, guarantor, judgment debtor or otherwise, including any obligation owed to a financial institution acquired by us, and it becomes due, we have the right under the law (called "setoff") and under this Agreement (by which you grant us a security interest in your certificates of deposit and other deposit accounts) to use the money from your account to pay the debt. We may use the money to pay the debt even if the withdrawal results in an interest penalty or the dishonor of checks. In the case of a partnership or joint account, each partner or joint owner agrees that we may use the money in their individual accounts to satisfy any one of their individual obligations. We may use the money if (a) you are a joint owner of the account and (b) you are not indebted to us and (c) the debt is owed to us by another joint owner. Similarly, each partner or joint owner agrees that we may use the money in their individual accounts to satisfy obligations in the joint account or partnership account. The security interest granted by this Agreement is consensual and is in addition to our right of setoff. To the extent any of the funds to be setoff are entitled to any exemption from execution, levy, attachment, garnishment, seizure or other legal or equitable process (including, without limitation, any Social Security, Supplemental Security Income, Veterans, or other federal or state benefits), then, to the maximum extent allowed by law, you hereby knowingly, affirmatively and unequivocally waive such exemption and co to our setoff against such funds as contemplated by this Agreement.

Regulatory authorities require banks to document their cash management arrangements with their customers. In such a cash management relationship, the customer and its related entities (e.g., subsidiaries and affiliates, including a parent company) that are also customers understand and agree that, for each such legal entity, payments made from any such customer's account will be honored by us so long as the aggregate total of such customer's and its related entities' accounts has a net credit balance.

17. **NOTICES.** Any notice we send you will be considered effective when it is deposited in the U.S. Mail to your most recent address reflected in our records. Notice from you will be considered effective when we receive it at our designated address.

18. **CLOSING YOUR ACCOUNT.** We reserve the right to close your account at any time without advance notice. The closing of your account (whether by you or by us) does not release you from any fees or other obligations incurred before closure, those you incur in the process of closing your account, or for your liability for outstanding items. In addition, you may lose the interest that has accumulated since the last time interest was added to your account. You will be subject to an early withdrawal penalty if you make withdrawals from or redeem a certificate of deposit or other time deposit early, as hereinafter explained.

19. **REPORTING INFORMATION.** We have the right to report information about your account to any credit reporting agency or to anyone to whom you give us as a reference. Wachovia shares customer transaction and experience information with affiliates within Wachovia Corporation (e.g., Wachovia Bank, National Association, Wachovia Securities, Inc., Wachovia Mortgage Corporation, etc.) through a central information system. Wachovia is permitted by the Fair Credit Reporting Act to share any other customer information among Wachovia affiliates. Wachovia will never share this "other information" with any non-affiliated third party for any reason other than those already stated in this Agreement.

Sharing of "other information" among Wachovia's affiliates can be used to improve our services to you. However, you may opt out of such sharing with Wachovia affiliates. In order to do so send your name, address (as it appears on your account statement), social security number or tax ID, telephone number, and account type and number to:

**Wachovia, P.O. Box 11726,
Roanoke, VA 24022-1726.**

(Your request must be mailed in a separate envelope and should not be included in any other bank correspondence.) Please note that each customer has the right to direct Wachovia not to share information other than transaction or experience information about them with its affiliates. Each customer, including each joint owner, may separately choose to ask that his or her "other information" not be shared among Wachovia affiliates. Customers who request that "other information" not be shared may do so only for themselves, and may not do so for anyone else, including joint account owners. We will process any request received as quickly as possible. You authorize us to tell payees of items drawn against your account whether sufficient funds are then available.

20. **ABANDONED/DORMANT ACCOUNTS.** If you fail to notify us in writing of any change to your current mailing address or you fail to utilize your account, your account and deposits may be presumed dormant or even abandoned after a certain period of time. Dormant accounts may be subject to reasonable service charges (similar to those imposed on active accounts), and service charges may also be imposed on accounts presumed to be abandoned. Accounts that are presumed to be abandoned will be escheated to the state of your last known address in which your account is maintained in accordance with applicable law.

21. **PLACEMENT OF ENDORSEMENTS.** If you issue a check that contains a carbon band, printing, endorsements or other material on the back of the check outside of the area extending 1½ inches from the trailing edge of the check, that material could also interfere with endorsements by banks and cause delays in returning the check. Similarly, if you or a prior endorser shall have signed, stamped or affixed an endorsement to a check for deposit which endorsement is outside of the area extending 1½ inches from the trailing edge of a check, that material could also interfere with endorsements by banks and cause delays in returning the check. Therefore, (a) you agree we will not be liable to you because an item you deposit in your account is returned after the time set by applicable law if the delay in returning the item is caused by markings on the item in the space reserved for the depositary bank's endorsement that were made by you or a prior endorser; and (b) you indemnify and hold us harmless from any and all claims, losses, costs and expenses (including, without limitation, attorneys' reasonable fees and the costs of litigation) that we may incur as a result of the late return of a check caused by a carbon band, printing, endorsements or other material on the back of any check drawn on or deposited to your account that extend outside the area extending 1½ inches from the trailing edge of the check. The trailing edge is the left side of the check when viewing it from the front.

22. **STALE, TIME-DATED AND POST-DATED ITEMS.** We maintain the option either to pay or to dishonor any stale check (i.e., a check that is more than six (6) months old) upon presentation to us. Our check processing equipment is unable to detect time-dated checks (i.e., checks stating that they are not valid after a certain date or beyond a certain period of time). As a result, you agree that we will not be liable to you for charging your account after the date or period stated on an otherwise properly payable time-dated check, and you further agree that we are not bound by any time limitation or restriction you may place on any item presented for payment against your account. If any item has not been paid within the time you want, you agree that your sole method to prevent payment is to place a stop payment order, as provided herein. Similarly, our check processing equipment cannot detect a post-dated check (i.e., a check bearing a date later than the actual calendar date). Therefore, it is not recommended that you issue post-dated checks as a means of withdrawal and you agree that we are not responsible for charging your account before the indicated date on a properly payable but post-dated check.

23. **NIGHT DEPOSITORY SERVICES.** If you wish to use our night depository services, the acceptance by us of an authorized night deposit bag and its contents, and your selection and use of such a bag, are subject to the following terms and conditions:

    **A.**    You shall indicate by signing a Night Deposit Agreement that you will use hold bags and the Bank will not process the deposit(s) until one of your authorized agents has signed for the bag(s).

The bag by whom or released to the authorized agent that has signed the Night Deposit Agreement.

    **B.**    You may deliver and pick up the deposit bag by armored courier, or by courier designee, or by any other agent or employee. All such couriers or courier designees shall be deemed to be your agents.

    **C.**    Each night deposit bag at time of delivery to us shall contain a deposit ticket accurately describing the cash, checks and/or other items contained in the bag and containing your name and the number of the account to which we are to make the deposit, and it shall be securely sealed. We reserve the right, in our sole discretion, to refuse to accept the bag or process any deposit if the bag appears torn or tampered with in any way. We will promptly give you notice of our refusal to process the bag. We shall not be deemed to have possession of the bag or any contents if we have refused to accept or process the bag pursuant to this paragraph, and we shall have no liability to you if we refuse to process the bag.

    **D.**    You may deliver a night deposit bag into our night depository facility at any hour of the day or night, whether or not we are open for business. You will have received and acknowledged receipt of a key that opens such night depository facility, which key belongs to us and must be returned to us upon termination of your right to use the night depository facility or upon our demand. You may not permit any other person or entity to use any key entrusted to you or allow any other person or entity to make use of our night depository facility with any such key. We shall remove bags from the night depository facilities at least once a day on each day we are open for business. The Bank employee removing the bag or other Bank employee shall open the bag and process the contents in accordance with paragraph E. We may withdraw any night depository facility from use at any time without notice.

    **E.**    You hereby direct us to open your night deposit bag and deposit the contents to your designated accounts with us. We shall process the contents of the bag in accordance with our normal processing procedures. We will notify you upon discovery of any discrepancy or missing documentation. Our count of the coins and currency contents of the bag shall be conclusive as to the amount it contains. We will conditionally credit all checks and other items contained in the bag as shown on the deposit ticket subject to later verification and final settlement. Notwithstanding the foregoing, we shall not be liable for opening or not opening the bag.

    **F.**    You agree that nothing will be placed in a night deposit bag except money, checks and other like negotiable items ("Property"), and no Property will be placed in the chute to the night depository facility unless enclosed in a properly sealed or locked bag. The use of the night depository facility shall be at your sole risk. You agree that neither we nor any of our agents shall be responsible for any loss or damage incurred by you in the use of the night depository facility which results from a mechanical defect of the facility, from an act of God, from the inability of the user to properly operate the facility, or from acts of vandalism or malicious mischief unless such loss or damage is caused by our gross negligence or intentional misconduct.

    **G.**    Prior to the receipt and acceptance of the contents of your night deposit bag by us as a deposit, the relationship between you and us as to all Property placed in the night depository facility shall be that of bailor and bailee of such Property, and we shall be liable to you not as an insurer of such Property, but only for that degree of care required of a gratuitous bailee having the custody of the property of others. No debtor/creditor relationship shall exist between you and us with respect to any cash, check or other items contained in the bag until we shall have received and accepted the contents of the bag as a deposit, credited the amount to your account and, in the case of noncash items, when we have finally collected the check or item. We shall not be liable for any act performed by us, nor any claims, expenses, damages or losses arising therefrom, if such act is performed by us pursuant to instructions, written or oral, which we reasonably and in good faith believe to be yours. In no event shall we be liable for indirect, consequential, exemplary or punitive damages, even if we have been advised of such possibility.

**H.** The right to use a night deposit bag may be eliminated by us on seventy-two (72) hours notice given orally to you or your agents, or by written notice mailed to your last address shown on our books. We reserve the right to assess a fee for the use of our night depository services. Such fee will be in keeping with Bank policy and disclosed on the Schedule of Fees and Funds Availability for Commercial Accounts available at any financial center and other applicable fee schedules.

**24. COURIER BAG RETRIEVAL AND DELIVERY.** If you elect to have any night deposit bag delivered or retrieved by a third party whom you have authorized to do so under the terms of this Agreement, we shall not be responsible for determining the authority of the person(s) or entity purporting to be your agent. Notwithstanding anything to the contrary contained in this Agreement or elsewhere, you hereby indemnify, defend, and hold harmless Bank and each of its affiliates, directors, officers, employees, attorneys, and agents (to the fullest extent permitted by law) from and against any and all claims, demands, lawsuits, costs, expenses, fees, fines, obligations, liabilities, losses, damages, recoveries, and deficiencies, including interest, penalties and attorneys' reasonable fees and costs, whether direct, indirect, consequential, incidental or at any time asserted that the Bank may incur or suffer or that may arise out of, result from or relate to your third party agent or any person or entity purporting to be your third party agent retrieving, delivering and/or taking custody of any night deposit bag.

**25. TREASURY SERVICES.** If you wish to utilize our treasury services, your selection and use of our treasury services are subject to the terms and conditions described below. The treasury services are more fully described in the Automated Clearing House Terms and Conditions and separate Service Description(s) provided by us, both initially and at any time hereafter. You agree that if any terms and conditions of the Service Description(s) conflict with the terms of this Agreement, the terms and conditions of the Service Description(s) shall govern. We may change our operational procedures without amending this Agreement, upon notice to you. We have the right to modify services, require minimum balances or security, or terminate services in our sole reasonable discretion in the event that you breach or fail to honor any provisions of this Agreement or there occurs a material change in your financial condition.

**A. Documentation.** In our sole discretion, we shall determine the adequacy of the documents and instruments and we may delay the implementation of the treasury services you may prior to the receipt of adequate documents and instruments. You will promptly notify our Treasury Services Division in writing of any actual changes underlying or represented in the documentation, and will promptly execute and deliver new documentation as may be required by us. Until such new documentation is actually received by us and we have had a reasonable time to act thereon, we shall not be liable for any actions taken by us in reliance upon existing documentation and authorization. We reserve the right periodically to request, and you agree to provide upon our request, financial statements and other information we may feel are appropriate in consideration of various treasury or other depository services you ask us to provide or continue providing to you.

**B. Subsidiaries.** If you are executing this Agreement on behalf of separate corporate or commercial entities or subsidiaries as well as on your own behalf, you hereby represent and warrant to us that you have received proper authorization or powers of attorney from each of such separate corporate entities or subsidiaries and that you have full power and authority to bind such entities to the terms of this Agreement.

**C. Termination.** Either you or we may terminate the specified treasury services
by giving the other party at least thirty (30) days prior written notice. However, we may terminate all specified treasury services immediately, and we shall be entitled to any remedy available to us at law or equity, if (1) you fail to make any payment to us under any obligation when due, or (2) you seek protection under any law for the protection of those unable to pay their debts or you commence any proceeding in bankruptcy or one shall be filed against you, or (3) any failure or default by you shall occur under any of your obligations to us, or (4) you conduct a transaction that is inappropriate, or violates the terms and usage of the Service Descriptions provided by us, or violates any law; or (5) we shall determine, at any time, in the exercise of our sole reasonable discretion that we are insecure with respect to your compliance with the provision of this

Agreement or any term or condition. In the event of termination, for whatever reason, all sums and fees owed by you to us shall be immediately due and payable.

**D. Indemnification; Limitation of Liability.** You indemnify and hold us, our officers, employees and agents, harmless from any and all losses or claims of any kind arising in connection with the treasury services provided under this Agreement, except losses, claims, and expenses (including attorneys' reasonable fees and costs) arising out of the gross negligence or willful misconduct of the Bank or its employees. You further agree to indemnify and hold us, our officers, employees and agents harmless from any and all losses or claims of any kind arising out of actions taken or omitted in good faith by us in reliance upon instructions from you. We shall not be responsible or liable for acts or omissions of any other entity (not under our direct control) including, without limitation, any Federal Reserve Bank or transmission or communication facility. **EVEN IF LIABILITY IS ESTABLISHED FOR ACTUAL DAMAGES, IN NO EVENT SHALL WE OR YOU BE LIABLE TO THE OTHER FOR SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE FURNISHING, PERFORMANCE OR USE OF THE TREASURY SERVICES PROVIDED UNDER THIS AGREEMENT, EVEN IF WE OR YOU HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.** The limitations and exclusions in this paragraph shall apply to all claims of every kind, nature and description whether arising from breach of contract, breach of warranty, negligence or other tort, and shall survive the termination of this Agreement and any applicable Treasury Service Agreement.

**E. Disbursement Fraud Detection Services.** You acknowledge that we have developed and made available to you treasury services designed to reduce the likelihood that a fraudulent, unauthorized or altered check or other item will be paid. You also acknowledge that failure to utilize these treasury services could substantially increase the likelihood that a fraudulent, unauthorized or altered check or other item may ultimately be paid out of your account. You agree that if you fail to implement any of these products or services, or you fail to follow these and other precautions reasonable for your particular circumstances, you will be precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, that we will not be required to re-credit your account or otherwise have any liability for paying such items.

**26. TIME DEPOSITS.** At the Bank's option, time deposits may be issued in the form of a Certificate of Deposit (no longer issued), a passbook, or a time deposit for which no certificate is issued. On the initial or any subsequent maturity date, you may present your properly endorsed Certificate (for accounts where Certificates were issued), your passbook, or sign a receipt form (for accounts with no certificate issued) at any financial center and you will be paid the amount due. The certificate will serve as evidence of your account. If a time deposit certificate is lost or destroyed, we must be notified immediately in writing. Upon receipt of satisfactory indemnity and an affidavit to the effect that the certificate has been lost or destroyed and has not been pledged or assigned, we will close the account and reissue a Time Deposit Receipt. To the extent required to begin the running of the applicable statute of limitations, you will be deemed to have demanded payment of any time deposit that does not automatically renew for another term on the 31st day after its last maturity date.

**A. Redemption.** We may redeem the Time Deposit on the initial or any subsequent maturity date, and we may accelerate maturity if you default in the payment of money owed to us, applying the redemption proceeds against such obligations.

**B. Interest Calculation.** We use the daily balance method to calculate interest on your account. This method applies a daily periodic rate to the ledger balance in your account each day and to any interest you've earned that has not been credited to your account. The daily rate is 1/365 (or 1/366 in a leap year) of the interest rate. Interest is compounded at the frequency indicated on the Rate Disclosure provided from the opening date. Interest is paid from the date of deposit through the day prior to the maturity date, and begins to accrue on the business day you deposit non-cash items. The Annual Percentage Yield (APY) assumes that interest will remain on deposit for the term of the account. A withdrawal of interest will reduce earnings. Interest is credited in accordance with the terms of the Time

**C. Interest Rates.** The interest rate for your deposit is established based upon the amount of deposit, the type of product, and the term you select. Except for Step Rate CDs, the interest rate is fixed for the term of the account.

**D. Receiving Interest.** If you request at the time of purchase, earned interest may be withdrawn at intervals (specified by Wachovia) during the term of the Time Deposit without penalty. Methods of interest payments may be limited.

**E. Automatically Renewable Time Deposits.** If "Automatically Renewable" is indicated on your account opening documents, the following terms apply:

**1. Grace Period.** For time deposit accounts with a maturity of 7 through 31 days, you have one calendar day after the maturity date to withdraw funds without penalty. For all other time deposit accounts, you have 7 days after the maturity date to withdraw funds without penalty. This time period is known as a grace period.

**2. Automatic Renewal.** Unless your time deposit account is closed on the initial or any subsequent maturity date or within the grace period, the account will automatically be extended for a time period equal to the initial term beginning at the initial maturity date or at each subsequent maturity date. The interest rate for each renewal term will be the currently offered rate in effect on the maturity date for the term just ended.

**3. Withdrawal of Principal.** If any principal is withdrawn within the grace period and it is reinvested in any Wachovia account, interest will be paid through the grace period on the amount withdrawn at the interest rate in effect on the maturity date. However, interest will not be paid for the days in the grace period if any of the principal is withdrawn and not reinvested at Wachovia.

**F. Withdrawal of Interest.** As long as the principal is not reduced, interest earned during the initial or subsequent term may be withdrawn without penalty.

**G. Additional Deposits.** Additional deposits to your time deposit account are not permitted during the term of your account.

**H. Interest Added to Principal.** If the interest earned during the initial or subsequent term is not withdrawn or credited to another account on the maturity date or within the grace period after the term when earned, it will be added to and made part of the principal amount.

**I. Partial Withdrawals.** You are permitted to make partial withdrawals, $500 minimum, during the initial or any subsequent renewal term of your account, as long as the minimum amount required to open a time deposit account of that type remains on deposit. The partial withdrawal will be subject to early withdrawal penalties.

**J. Early Withdrawal Penalties.** If you make any withdrawal from or close your time deposit account before the maturity date, you may be subject to an early withdrawal penalty as described below:

If any of the time deposit is withdrawn before the initial or any subsequent maturity date, an early withdrawal penalty as shown below will be imposed on the amount withdrawn:

| Maturity Term Penalty | Early Withdrawal |
|---|---|
| 7 days through 90 days | All interest that would have been earned in the maturity period. |
| 91 days through 364 days | Amount equal to 90 days' simple interest. |
| 365 days and greater | Amount equal to 180 days' simple interest. |

**K. Convertible CDs Accounts.** Additional terms apply to Convertible CD accounts. A minimum of $1,000 is required to open an account. Twelve (12) Month Convertible CD accounts may be converted, after a nine (90) day waiting period, to a Wachovia CD account with a term of twelve (12) months or longer. Thirty-Six (36) Month Convertible CD accounts may be converted, after a one-year waiting period, to a Wachovia CD with a term of 36 months or longer. The interest rate and APY on the new CD, if converted, is the interest rate and APY in effect at that time for the selected product.

**L. Callable CD Accounts.** Additional terms apply to Callable CD Accounts. A minimum of $10,000 is required to open the account. Callable CD Accounts pay a premium rate of interest in return for our right to "call" the CD account at any time after one year from the date of deposit. If the account is not called, the initial interest rate and APY apply for the initial term. If the account is called, you would choose from the following three options:

- Funds may be reinvested in any other Wachovia deposit account at the current interest rate and APY in effect at the time.

- Funds may remain in the CD for the remainder of the term and earn no less than the minimum interest rate and APY disclosed at account opening.

- Funds may be withdrawn without penalty.

If the CD is called, a notice indicating the call date would be mailed to you. You have ten (10) calendar days from the date to reinvest or withdraw the funds without penalty. If no action were taken, the funds remain in the account for the remainder of the term, earning interest at a rate that is no less than the minimum rate disclosed at the time the account was opened. At its maturity the Callable CD automatically renews as a standard CD with the same term.

**M. Step Rate CD Accounts.** The following additional terms apply to Step Rate CD accounts. A minimum deposit of $1,000 is required to open the account. The interest rate in effect when the account is opened is increased at the following intervals: 183 days, 366 days and 548 days from the issue date as shown on your Rate Disclosure form. After the 548th day, the interest rate remains fixed until maturity. Step Rate CD accounts mature 24 months after account opening. At maturity, Step Rate CD accounts automatically renew as a standard, automatically renewing 24-month CD.

**27. INTEREST INFORMATION.** Interest will be compounded and credited as determined by the Bank. Please refer to the Schedule of Fees and Funds Availability for Commercial Accounts for details on interest compounding and payment methods. Interest rates for accounts vary from time to time. Your statement will also include the interest rate and the effective annual percentage yield earned for that statement period.

**28. COMMERCIAL MONEY MARKET ACCOUNTS.** You will earn our current applicable commercial money market account interest rate if you maintain a daily collected balance of the minimum amount. Please refer to your Schedule of Fees and Funds Availability for Commercial Accounts to confirm threshold balances for earning higher rates of interest.

**29. INTERNAL MONEY MANAGEMENT ACCOUNTING.** For regulatory and analysis purposes, your checking account will consist of two "sub-accounts" on our books: (1) either a non-interest-bearing (demand) account or an interest-bearing (NOW) sub-account, and (2) a money market sub-account. These sub-accounts are treated as a single account for statements and daily use of your account. Interest is not earned on either sub-account for non-interest-bearing checking accounts. On interest-bearing checking accounts, the same interest rate may be paid on both sub-accounts, and your periodic statement will reflect a single blended annual percentage yield (APY) earned.

Whenever your checking sub-account balance exceeds a threshold amount (which we may set and change at our discretion), we may transfer funds above that amount to the money market sub-account. As these funds are needed to pay items presented against your checking account, we will transfer funds from the money market sub-account to the checking sub-account, up to six (6) times per statement month. If a sixth transfer were needed, the entire balance in the money market sub-account would be transferred into the checking sub-account. This process may be repeated each statement month.

This internal accounting process has no effect on daily use of

30. **POLICY FOR PAYMENT OF INTEREST ON COLLECTED BALANCES.** Interest begins to accrue on interest bearing deposit accounts no later than the business day we receive credit for the deposit of noncash items deposited to your account. We receive credit for checks drawn on other financial institutions based on the availability schedule established by the applicable branch of the Federal Reserve Bank and other correspondent banks. The balance in interest bearing deposit accounts for which we have received credit is called the collected balance. Interest is paid on the net amount of the collected balance less applicable reserves.

31. **BUSINESS SAVINGS ACCOUNTS.** Your balance(s) will earn interest at our current Business Savings interest rate. Please refer to your Schedule of Fees and Funds Availability for Commercial Accounts to confirm tiers for earning higher rates of interest (may not be applicable in all states).

32. **INTEREST-BEARING ACCOUNT LIMITATIONS.** We are required under federal regulation to retain the right to ask for seven (7) days' written notice before you withdraw money from any interest-bearing accounts. Unless you receive different instructions from us, you can make withdrawals by writing a check on the applicable account, except on Business Savings accounts.

33. **COMMERCIAL MONEY MARKET ACCOUNT TRANSACTION LIMITATIONS.** You may make unlimited withdrawals in person from your Commercial Money Market Account. However, federal regulations limit third party transactions or pre-authorized transfers from your account (including overdraft transfers) or transfers made by personal computer (including online banking or bill payment services) or telephone (including facsimile or data transmission) to six per statement period, no more than three of which may be by check, draft, or debit card. If this limitation were exceeded on a regular basis, we would be required to convert your account to another account that permits unlimited check writing privileges. A fee will be imposed for items posted during a statement period in excess of this limit (see the Schedule of Fees for the amount of the fee). We will determine the number of third party checks for your statement period based on the posted date of the third party checks.

34. **BUSINESS SAVINGS ACCOUNT TRANSACTION LIMITATIONS.** You may make unlimited withdrawals in person from your Business Savings Account; however, under federal regulations you are not permitted to make more than six (6) pre-authorized transfers (including telephone transfers, automatic transfers, overdraft transfers, and transfers made by personal computer) and drafts. If this limitation were exceeded on a regular basis, we would be required to close your account and to open another account that permits unlimited check writing privileges. Withdrawals can only be made by those persons authorized by previously submitted resolutions.

35. **CLIENT FUND MANAGER.** Your master account is a non-interest bearing checking account established in your name to link it to related client accounts. We are not acting as escrow agent or in any other fiduciary capacity with respect to your master account or client accounts. Each client account will be a separate interest bearing money market account or non-interest bearing checking account opened by you in the name of a party or parties to be designated by you at the time these accounts are opened. You are required to provide us with the name and taxpayer identification number of the party whose name the client account is being opened. A deposit ticket that indicates your client's name and account number must accompany each deposit. You authorize us to accept deposits for credit to client accounts as designated by you. Withdrawals from a client account can only be made by first transferring funds to the master account. Before you close your master account, you must transfer any balances remaining in your client accounts to the master account.

36. **TRANSFER OF ACCOUNTS/ASSIGNMENT OF DEPOSITS.** No accounts are transferable. Business Savings accounts and CDs are assignable only with our prior written consent. We may, in our sole and absolute discretion, withhold such consent. No assignment will become effective until we have documented it in our records.

37. **LEGAL PROCESS AFFECTING ACCOUNTS.** If legal action such as an attachment, garnishment, levy or other state or federal legal process ("legal process") is brought against your account, we may refuse to permit (or may limit) withdrawals or transfers from your account until the legal process is satisfied or dismissed. If we receive any document that purports to be legal process issued out of any court or governmental agency, you hereby authorize us to accept and comply with, no matter how it was received by us. You hereby direct us that we not contest on your behalf any such legal process and may take action to comply with such process as we determine to be appropriate in the circumstances without liability to you, even if the legal process purports to affect the interest of only one owner of a joint account and even if any funds we may be required to pay out leaves insufficient funds to pay a check you have written. If we incur any expenses, including without limitation, attorneys' reasonable fees, in connection with any such document or legal process, you are liable to us in such amount and we may charge any expenses and fees to your account or any other account you may have with us without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment of other levy against your account is subject to our right of setoff and security interest. You agree that because we have financial centers or offices in numerous jurisdictions and states other than where your account was opened, if we are served with any process as referenced above in any jurisdiction or state, you hereby direct us to recognize and honor such service of process.

38. **POWER OF ATTORNEY.** You agree to authorize and direct us to receive, accept, pay and/or apply, without any duty of inquiry, without limit as to amount, and without regard to the application of the proceeds, any check, draft, or other instrument for the payment of money drawn by any of your agents or attorneys in fact on or payable from your accounts including, but not limited to, those endorsed to the order of such agent/attorney-in-fact or otherwise for the personal credit of such agent/attorney-in-fact.

39. **OTHER ADVERSE CLAIMS.** If we receive notice of an actual or potential adverse claim to your account or the funds in your account, we may at our discretion refuse to pay out any money from your account for a reasonable period of time after receipt of notice of the actual or potential claim. Although we reserve the right to refuse to pay out any money from your account if we have received notice of an actual or potential claim, we are not required to recognize any adverse claim unless (a) the claimant provides us with an acceptable bond indemnifying us against any and all liabilities, losses, damages, costs and expenses that we might incur in connection with payment of the adverse claim and any resulting dishonored checks or other items or (b) the claimant has obtained an order requiring us to recognize the adverse claim from a court of proper jurisdiction.

40. **CONFLICTS/DISPUTES INVOLVING THE ACCOUNT.** If we receive an actual or potential claim from a third party regarding your account, any deposit, transfer, credit or other transaction involving your Account, or conflicting instructions or claims from authorized signers, you hereby grant to us full discretion to freeze your Account and not honor any further transactions until the claim is resolved, or we may, at our discretion, choose not to pay out any money from your account until we receive consistent instructions from all parties or a court order, all without liability to you. We may also, without liability to you, close the account and issue a check made payable to you and each authorized signor or you and each claimant, as we deem necessary, or we may interplead the funds into court. You agree to reimburse us for any loss, costs or expenses including, without limitation, attorneys' reasonable fees and the costs of litigation (to the extent permitted by law) that we incur as a result of any dispute involving your account, and you authorize us to deduct any such loss, costs, or expenses from your account without prior notice to you. This obligation includes any dispute between you and us involving the account and situations where we become involved in any dispute between you and an authorized signor, another joint owner, or a third party claiming an interest in the account. It also includes any situation where you, an authorized signor, another joint owner, or a third party takes action with respect to the account that causes us, in good faith, to seek the advice of counsel, whether or not we actually become involved in a dispute.

41. **CHANGING THIS AGREEMENT.** We can change the rules for any of the accounts described in this Agreement at any time. We will notify you within a reasonable time before the change will take effect if the change is not in your favor.

42. **CUSTOMER'S WAIVER OF NOTICE.** By signing the Signature Card you waive any notice of nonpayment, dishonor or protest regarding any items credited to or charged against your deposit account. For example, if a check that you deposited were dishonored and returned to us, we are not required to notify you of the dishonor.

**43. WAIVER OF RIGHTS BY THE BANK.** Our failure to exercise, or any delay in exercising, the right to waive the enforcement of any of the terms of this Agreement with respect to any transaction or series of transactions. Any such waiver will not affect our right to enforce any of our rights with respect to other customers or to enforce any of our rights with respect to later transactions with you and is not sufficient to modify the terms and conditions of this Agreement.

**44. INVALIDITY OF CONTRACT PROVISIONS.** In the event any one or more of the provisions of this Agreement shall for any reason, including under any applicable statute or rule of law, be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

**45. FORCE MAJEURE.** You agree we shall have no responsibility or liability to you or any third party for failure or delay in our performance under this Agreement or for any losses due to causes or conditions including, without limitation, delays and/or interruptions of business due to any act of God, natural disaster, fire, act of government authority, act of public enemy or war, riot, civil disturbance, insurrection, labor difficulty, power failure, telecommunications failure, severe adverse weather condition or other causes beyond our reasonable control. The time, if any, required for such performance under this Agreement shall be automatically extended during the period of such delay or interruption.

**46. APPLICABLE LAW.** Our deposit relationship with you is governed primarily by this Agreement. However, it is also governed by the laws of The United States of America; the rules and regulations of the Board of Governors of the Federal Reserve System and various Federal Reserve Banks; and the rules and regulations of other proper bank supervisory authorities and other governmental agencies. To the extent state law applies to our deposit relationship, the applicable law is the law of the state where your account was opened as contained in our records. If there is any conflict between this Agreement and applicable federal or state law, this Agreement will be considered changed to the extent necessary to comply with the law. If any provision in this Agreement is declared to be invalid, unenforceable or illegal, that part will not affect the validity of other provisions.

**47. ARBITRATION OF DISPUTES/WAIVER OF JURY TRIAL AND PARTICIPATION IN CLASS ACTIONS.** If either you or we request, any dispute or claim concerning your account or your relationship to us will be decided by binding arbitration under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the US Code. Arbitration hearings will be held in the city where the dispute occurred or where mutually agreed. A single arbitrator will be appointed by the agreement of the parties, or, if the parties are unable to agree, by AAA and will be a retired judge or attorney with experience or knowledge in banking transactions. Each party will pay its own costs and attorney's fees. A court may enter a judgment on the award. Any statute of repose or limitations period which would provide a defense to a claim brought in a lawsuit in state or federal court will also apply with equal force and effect to any arbitration brought pursuant to this section.

To the extent permitted by law, if any dispute or claim results in a lawsuit, and neither you nor we have elected or requested arbitration, you and we knowingly and voluntarily agree that a judge, without a jury, will decide the case. The arbitration or trial will be brought individually and not as part of a class action. If it is brought as a class action, it must proceed on an individual (non-class, non-representative basis). YOU UNDERSTAND AND KNOWINGLY AND VOLUNTARILY AGREE THAT YOU AND WE ARE WAIVING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN ANY CLASS ACTION LAWSUIT.

**48. ACCURACY AND VERIFICATION.** THIS PARAGRAPH APPLIES ONLY TO SOLE PROPRIETORSHIP ACCOUNTS. You acknowledge and agree that any information you have supplied or will supply to us is and shall be complete and correct. You agree that we may request reports from credit bureaus and consumer reporting agencies to investigate or reinvestigate any information provided by you in connection with your application for any account. We may also verify your employment, salary, assets, debts, and references.

**49. INDEMNIFICATION OF BANK.** You hereby indemnify and hold us, our officers, employees and agents harmless from any and all losses, or claims of any kind arising in connection with the Services provided under this Agreement, except those losses, claims, and expenses (including attorney's fees and costs) arising out of the gross negligence or willful misconduct of the Bank or its employees. You further indemnify and hold us, our officers, employees and agents harmless from any and all losses or claims of any kind arising out of actions taken or omitted in good faith by us in reliance upon instructions from you. We shall not be responsible or liable for any other entity's (not under our direct control) acts or omissions including, without limitation, any Federal Reserve Bank or transmission or communication facility. EVEN IF LIABILITY WERE ESTABLISHED FOR ACTUAL DAMAGES, IN NO EVENT SHALL WE OR YOU BE LIABLE TO THE OTHER FOR SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE FURNISHING, PERFORMANCE OR USE OF THE SERVICES PROVIDED UNDER THIS AGREEMENT, REGARDLESS OF WHETHER WE OR YOU MAY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES UNLESS REQUIRED BY APPLICABLE LAW. The limitations and exclusions in this paragraph shall apply to all claims of every kind, nature and description whether arising from breach of contract, breach of warranty, gross negligence or other tort, and shall survive the termination of this Agreement and applicable Treasury Services agreements.

**50. YOUR REPRESENTATIONS, WARRANTIES AND COVENANTS.** You represent and warrant to the Bank that: (a) All information, including financial information, whenever provided by you to the Bank, shall be true, correct and complete. Information relating to your financial condition accurately reflects your financial condition as of the date(s) thereof; (b) You are not insolvent within the meaning of 11 U.S.C. Section 101 (32); (c) You are in compliance with all federal, state and local laws applicable to your properties, operations, business and finances; (d) You are duly organized and in good standing under the laws of the state of your organization, and you have all powers, licenses, authorizations and approvals to operate your business as now conducted; (e) You will promptly notify the Bank of the existence of any condition or event which may constitute a breach of or default under this Agreement; (f) You will promptly notify the Bank in writing of (i) any change in your financial condition or business; (ii) any change in your name, address or business structure, ownership, organization, or other information you provided to us to open the account (e.g., a change in your driver's license or other personal identification number); and (iii) any material litigation affecting you; (g) Upon the Bank's request therefor, you will promptly deliver to the Bank true and correct copies of your financial statements, reports, notices, and proxy statements sent to shareholders, and such other information regarding your operations, business affairs and operations including, but not limited to, income statements, balance sheets and statements of cash flows.

**51. SIGNATURES RECEIVED VIA FACSIMILE (FAX):** If you fax any document to us signed, you agree that it was your intention that: (i) your fax signature is an electronic signature under applicable federal and state law, (ii) the fax be an original document, (iii) you intend on conducting business with us by electronic records and electronic signatures, (iv) your consent under (iii) to be electronically given under applicable federal and state law.

**52. ENTIRE AGREEMENT.** This Agreement and the documents to which it refers constitute your and our entire agreement and understanding and supersede all prior agreements and understandings. This Agreement may not be changed orally. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

## II. SPECIAL TERMS AND CONDITIONS FOR WIRE TRANSFERS

If you wish to use our wire transfer service, the following terms and conditions shall govern all transactions for our acceptance and processing of your payment orders, credits and related requests. If a discrepancy were determined to exist between these Terms and Conditions and other provisions of this Agreement, then these Terms and Conditions shall control but only to the extent necessary to address the discrepancy. Unless otherwise defined below, the terms used in this Section II of this Agreement shall have the same meaning as set forth in Article 4A of the Uniform Commercial Code of the state in which your account or relationship is maintained.

**1. AUTHORIZATION AND SECURITY PROCEDURE.** We have established operating rules and security procedures for you to initiate and receive funds transfers to or from your account(s), which rules and procedures include a requirement for you to sign a "Funds Transfer Schedule A - Authorization and Security Procedures," or such other document as we may require, the terms

of which are incorporated by reference and a part of this Agreement. Such Funds Transfer and Authorization Schedule contains the rules and procedures ("Security Procedures") which you and we will use to process payment orders initiated by you. Additional call back procedures may be utilized by you as described in the Security Procedures. You agree that the Security Procedures are commercially reasonable in light of your circumstances and the type, value and frequency of the payment orders you will request. You also agree to keep the Security Procedures confidential and not to disclose the Security Procedures to anyone except the persons whom you have authorized to make transfer requests on your behalf ("Authorized Representatives"). If you or any of your Authorized Representatives have reason to believe that a Security Procedure may have been learned by an unauthorized person, you agree to notify us immediately at the telephone number indicated in the Authorization Schedule. If we receive a payment order (or related request) in accordance with your Security Procedure, it shall be conclusively deemed authentic and we shall be entitled to rely thereon. You are responsible for the accuracy of the initial communication of the payment order as well as the accuracy of any documentation or callback of the payment order made by us. You, for yourself and each of your Authorized Representatives, agree that we, in our sole discretion, may record any telephone conversation between you or any Authorized Representative and us.

**2. EXECUTION OF PAYMENT ORDERS.** If we receive a payment order that has been verified according to Security Procedures, you authorize and direct us to debit your account(s) as listed on the Authorization Schedule and transfer the funds. We are also authorized to implement any instructions, including amendments or cancellations of prior payment orders, upon verification of such instructions. We are authorized to rely on any payment order believed by us in good faith to have been given by an Authorized Representative. We may handle payment orders received from you and other customers in any order selected by us and, unless otherwise instructed by you, we may use any means, intermediaries or funds transfer systems which may have operating rules governing the execution of payment orders to effect the transfer as we, in our sole discretion, shall determine.

**3. CUT-OFF TIMES.** We must receive all payment orders before the cut-off time for funds transfers on a business day established by us from time to time. Any payment orders or related requests received after such deadlines, or on weekends, holidays for us or the bank or institution to receive the transfer, or the funds transfer system to be used, will be treated as received on our next funds transfer business day. We will make reasonable efforts to execute all payment orders received prior to the deadline.

**4. ADVICE OF FUNDS TRANSFERS.** Unless otherwise agreed in writing, we will not provide a next-day wire transfer summary statement or confirmation. Instead, we will notify you of a receipt or payment by wire transfer in any periodic statement provided to you. You agree to examine each of your periodic statements promptly upon receipt and to notify us immediately of any discrepancies between the periodic statement and your records. We shall not be liable for interest compensation unless we are notified of the discrepancy within thirty (30) days after the date of your statement indicating the debit for the payment order in question. You agree that your right to assert a claim against us with respect to any transaction reasonably identified on a statement shall expire one (1) year after the date of the transaction which becomes the basis for such a claim.

**5. LIMITATION OF LIABILITY AND INDEMNIFICATION.** You expressly agree that we shall be liable to you only for our erroneous execution of a payment order. We shall not be liable for any errors or the part of any third party including, without limitation, third parties used by us in executing a payment order or performing a related act and no such third party shall be deemed to be our agent. We shall not be liable for your refusal to honor any request if we, in good faith, are unable to determine to our satisfaction that such request is valid, based upon our adherence to the Security Procedures. **IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES EVEN IF WE SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.** Except as may be limited by applicable law, you agree to indemnify us and hold us harmless (including the payment of attorneys' reasonable fees) against all liability to third parties arising out of or in connection with the terms and conditions of this Agreement and the services provided hereunder or otherwise pursuant to your instructions.

**6. USE OF IDENTIFYING NUMBERS.** In the event a payment or payment order identifies a beneficiary, beneficiary's bank or intermediary bank incon-sistently by name and an identifying number (such as an account number, S.W.I.F.T. address or universal identification number), payment may be made by the intermediary or beneficiary bank on the basis of the identifying number, even if the identifying number identifies a person or entity different from the named person or entity in your payment order and that your obligation to pay the payment order shall not be excused by your error. We will rely on the identifying number as proper identification of a beneficiary.

**7. INTEREST COMPENSATION.** In the event that we shall be liable to you for interest compensation under this Agreement or by applicable law, interest shall be calculated on the basis of the average Federal Funds rate for the period involved. You agree that we may, at our sole option, pay interest compensation as follows: (1) by lump sum payment of cash, or (2) by providing a credit to your account with us.

**8. INTERNATIONAL PAYMENTS.** Orders for the transfer of U.S. Dollars shall be paid in U.S. Dollars if transferred to a beneficiary located in the United States or its protectorates or territories. If transferred to a beneficiary located elsewhere, the beneficiary's bank may elect to pay the beneficiary in foreign currency at the bank's buying rate of exchange for wire transfers. It is your responsibility to advise the beneficiary of this possibility. We may send any message relative to this order in explicit language, code or cipher. Foreign currency transfer orders are final when made to us. However, pursuant to the request of the originator, and only if possible, we may cancel or amend any order before the transfer is effected. We shall incur no liability if we are unable, for any reason, to cancel or amend an order. Refunds of U.S. Dollar orders shall be in the U.S. Dollar amount. Refunds of foreign currency orders shall be in the amount of U.S. Dollars that can be bought for the foreign currency amount at our then current rate of exchange. The originator bears all risk of loss due to fluctuation in the rate of exchange. No transfer fee shall be refunded.

**III. SPECIAL TERMS AND CONDITIONS FOR AUTOMATED CLEARING HOUSE (ACH) TRANSACTIONS**

If you wish to use our ACH service, the following terms and conditions shall govern all transactions arising out of this service. If a discrepancy were determined to exist between these Terms and Conditions and this Agreement, then these Terms and Conditions shall control but only to the extent necessary to address the discrepancy.

**1. SERVICES.** The ACH services to be performed by us and in accordance with the rules of the National Automated Clearing House Association ("NACHA"), (hereinafter, the "Rules") as such Rules are amended from time to time include the transmission of electronic credit and/or debit entries (hereinafter "Entries") initiated by you and processed through us from your demand depository account(s) with us (the "Accounts") to accounts maintained with us and at other banks and financial institutions by means of NACHA in conjunction with the Federal Reserve Bank (the "Services"). With respect to such Entries, we will act as an Originating Depository Financial Institution and you will act as Originator, as defined in the Rules. As Originator, you agree to be bound by the Rules as amended from time to time and you agree that you will handle all aspects relating to the processing of an Entry in a commercially reasonable manner. You acknowledge that Entries may not be initiated that violate the laws of the The United States of America. Capitalized terms in these Terms and Conditions, unless otherwise defined, will have the meaning given in the adoption of Article 4A of the Uniform Commercial Code in the state in which your account or relationship is maintained.

In accordance with the Rules and banking regulatory guidelines, companies using ACH services must be assigned exposure limits and meet minimum credit standards. These exposure limits represent the maximum ACH Dollar volume that can be originated and await final settlement over any three (3) banking days period. Specific exposure limits will be specific to a settlement deposit account. Efforts will be made to assign exposure limits that would be consistent with your historical ACH origination activity. We shall have the right to change or suspend these limits at any time in our sole reasonable discretion. Your failure to comply with such conditions and procedures can result in our requiring certain credit approvals in order to continue using our ACH services, or in our termination of your ACH services. Any such conditions and

procedures we may establish shall be deemed to be provisions of this Agreement.

2. **SERVICES PERFORMED.** You will give us instructions detailing the Services to be performed with regard to the initiation, acceptance, rejection and transmission of Entries; transfer of funds; accounts to be utilized as Authorized Accounts; and the disposition of information regarding the Services performed. When accepted by us, your instructions are hereby incorporated by reference as though fully set forth herein. Such instructions may be changed from time to time by you upon notice to and acceptance by us without disturbing the validity of these Terms and Conditions.

3. **RULES AND VERIFICATION OF ENTRIES.** You agree we will transmit Entries by means of the ACH Operator in accordance with the Rules. You agree that we are not required to verify Entry information but, instead, may rely that the information furnished by you is authentic, accurate and conforms to the Rules.

4. **OFFICE OF FOREIGN ASSETS CONTROL (OFAC).** The ACH system may not be used to process transactions in violation of OFAC sanctions. At a minimum, illicit transactions will be blocked or rejected and originators could face penalties.

5. **PRE-NOTIFICATION.** You agree to provide us with prescribed pre-notification information which we may require for all Entries that you intend to initiate, within the time limits prescribed by the Rules.

6. **CANCELLATION, AMENDMENT AND REJECTION OF ENTRIES.**

   A. **Cancellation and Amendment.** You will have no right to amend, cancel or stop payment of an Entry after its receipt by us. However, we will use reasonable efforts to act on such a request by you prior to transmittal to the ACH to the extent provided in Article Seven of the Rules, or, in the case of an Entry for transmittal to an account maintained with us ("On-Us Entry"), prior to crediting or debiting the On-Us Entry account, but we will have no liability if any such amendment, cancellation or stop payment were not effected, notwithstanding timely receipt of the amendment, cancellation or stop payment request.

   B. **Rejection by Bank.** We have the right to reject any Entry and may, at our option, reject an Entry that is in excess of the collected balance in the Authorized Account(s) or based on customer file limits. We will notify you by telephone or electronic transmission of such rejection no later than the business day such Entry would otherwise have been transmitted by us to the ACH. We will have no liability to you by reason of the rejection of any Entry or the fact that such notice shall not have been given at an earlier time than that provided for herein.

   C. **Rejection by ACH.** We have the right to place a limit on aggregate transfers of funds out of any Authorized Account that might result in a negative collected balance in the account or an overdraft occurring in the account. In the event any Entry shall have been rejected by any component of the ACH system or network for any reason whatsoever, it will be your responsibility to remake such Entry; provided, however, that we can remake any Entry when such a rejection by the ACH was due to a discrepancy in the Entry by us and sufficient data shall have been available to us to permit a remake of such Entry.

   D. **Unauthorized ACH Transactions.** If you receive an unauthorized transaction posted to your account, you shall have until 2:00 PM of the banking day after the item was posted to notify us to return the item as unauthorized. We will not be able to return the item after that time without the cooperation and agreement of the originating bank and the originating company. Any other action must be conducted between you and the originator of the transaction.

7. **RETENTION OF INFORMATION AND AUTHORIZATIONS.** You shall retain and provide to us, upon our request, all information necessary to remake any Entry for three (3) days after midnight of the Effective Date of an Entry. For the purposes of these Terms and Conditions, the "Effective Date" shall be the day on which the offsetting Entry shall have been posted to the Authorized Account(s), as stated in your Instructions. You will retain an original or copy of each

authorization for six (6) years after the date of termination or revocation of such authorization.

8. **INCONSISTENCY OF NAME AND ACCOUNT NUMBER.** You acknowledge and agree that if an Entry were to describe the Beneficiary/Receiver of the Entry inconsistently by name and account number, payment of the Entry transmitted by us may be made on the basis of the account number even if the identifying number identifies a person or entity different from the named Beneficiary/Receiver and that your obligation to us for the amount of the Entry shall not be excused in such circumstance by your error.

9. **SECURITY PROCEDURES.**

   A. **Agreement to Security Procedures.** You and we acknowledge that, as part of your Instructions for the Services, you and we have agreed to certain security procedures (hereinafter "Security Procedures"), which you and we will use to verify that Entries are correct and valid or are those of the Company. You agree that such Security Procedures are and shall be Commercially Reasonable in light of your circumstances and the type, value and frequency of the Entries you will initiate.

   B. **Security Procedures.** For Electronic Data Transmission of ACH Entry file(s) to us by you and for Electronic Data Transmission of ACH files to us from you when we are retrieving the file(s), you shall utilize security procedures provided by us, and you further agree that the security provided shall have been Commercially Reasonable data security. If our transmission software were to accept the file(s) or successfully retrieve the file(s) based on this security and the file(s) were in ACH system readable format, you agree that acceptance shall have occurred and we may process the file(s).

   C. **Confidentiality of Security Procedures.** You agree to keep the Security Procedures confidential and not to disclose the Security Procedures to anyone except Authorized Representatives. If you or any of your Authorized Representatives have reason to believe that the Security Procedures may have been learned or are known by an unauthorized person, you agree to notify our Treasury Services Technical Services area immediately.

   D. **Modification of Security Procedures.** All modifications and additions to the Security Procedures or list of Authorized Representa-tives must be in writing, except if you request us by oral instructions to delete a name of an Authorized Representative, in which event, you shall immediately send us written confirmation of such deletion.

10. **RETURNED ENTRIES.** We will use reasonable means to notify you of receipt of a returned Entry. We will have no obligation to re-transmit a returned Entry, unless we have agreed otherwise in writing. We will credit the Account(s) for any amount received by us by reason of the return of any Entry transmitted by us for which we have previously received payment from you.

11. **ON-US ENTRIES.** Except as provided in the Rules and these Terms and Conditions, in the case of an On-Us Entry received by us for transmittal, we will credit the Beneficiary/Receiver's account in the amount of such Entry on the Effective Date contained in such Entry provided the requirements of your Instructions and Security Procedures are met. If any such requirement were not met, we would use reasonable efforts to credit the Beneficiary/Receiver's account in the amount of such Entry on the next business day following such Effective Date.

12. **PROVISIONAL PAYMENT.** Payment of an Entry by the Beneficiary/Receiver's bank to the Beneficiary/Receiver will be provisional until receipt by the Beneficiary/Receiver's bank of final settlement for such Entry. You specifically acknowledge that you have received notice of such settlement rule and the fact that, if any such settlement were not received, the Beneficiary/Receiver's bank would be entitled to a refund from the Receiver/Beneficiary or the amount credited, and you would not be deemed to have paid the Receiver/Beneficiary the amount of the Entry.

**13. COLLECTED FUNDS.**

    **A. Credit Entries.** When you initiate a credit Entry, you shall provide good collected funds in the Authorized Accounts to cover any credit Entry initiated by us no later than 2:00 PM on the applicable effective date. For the purposes of these Terms and Conditions, "good collected funds" shall mean funds subject to immediate withdrawal.

    **B. Debit Entries.** When you initiate a debit Entry, you will receive immediately available funds in the Authorized Accounts for any debit Entry initiated by you on the applicable effective date or the next banking day after our receipt of the debit Entry information from you. You will promptly provide good collected funds into the affected Authorized Account to indemnify us if any debit Entry is rejected after we have permitted you to withdraw good collected funds in the amount thereof or if any adjustment memorandum that relates to any such Entry is received by us.

**14. AUTHORIZATION WARRANTY.** With respect to each Entry submitted to us you represent and warrant to us that:

    **A. Authorized.** The employee or other person or entity to whom such Entry pertains is an Authorized Representative and shall have authorized such Entry in writing prior to the submission thereof to us and such authorization shall have been effective at the time of delivery or transmittal of such Entry, and shall so remain until acceptance of the Entry by the Beneficiary/Receiver's bank;

    **B. Evidence.** You will maintain written evidence of such authorizations in accordance with all applicable laws, rules and regulations and will furnish us with a copy if requested by us; and

    **C. Accurate.** The Entry is accurate, in proper form, timely and conforms to all obligations owed by you to the applicable Receiver/Beneficiary.

**15. TELEPHONE-INITIATED ENTRIES.** With respect to telephone-initiated Entries, you acknowledge and agree that you assume the following additional obligations and you further represent and warrant that:

    **A. Information.** You shall have disclosed the information required by the Rules to the consumer during the telephone call.

    **B. Confirmation.** You shall have tape recorded the telephone conversation authorizing the Entry or provided written confirmation of the consumer's authorization as required by the Rules.

    **C. Verification.** You shall have verified the consumer's identity and routing number, as well as the Receiver's identity and routing number.

Any liability for any failure on your part to comply with the Rules will be borne by you to the extent that your failure resulted in such liability.

**16. INTERNET-INITIATED ENTRIES.** With respect to internet-initiated Entries ("WEB Entries"), you agree that you will maintain an annual security audit as required by the Rules. You understand that we are required by the Rules to set specific exposure limits and you agree to comply with such exposure limits.

**17. YOUR LIABILITY.** You are and shall be responsible for any loss, costs incurred, and/or claims made against us for your failure to obtain the correct identity, proper authorization (by provision of prior notices, if applicable, to the Receiver, and other appropriate authorization and source documents, if applicable) and other information regardless of the reasonableness of any procedures employed by you, as well as any failure to provide timely copies or source documents when requested by us.

**18. LIMITATION OF LIABILITY AND INDEMNIFICATION.** You expressly agree that we shall be liable to you only for our erroneous execution of a payment order. We shall not be liable for any errors or delay on the part of any third party including, without limitation, third parties used by us in executing a payment order or performing a related act due to any cause other than our own failure to exercise reasonable and ordinary care, and no such third party shall be deemed to be our agent. We shall not be liable for our refusal to honor any request if we, in good faith, are unable to determine to our satisfaction that such request is valid, based upon our adherence to the Security Procedures. **IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, OR CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF WE SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.** Except as may be limited by applicable law, you agree to indemnify us and hold us harmless (including the payment of attorneys' reasonable fees, costs and expenses) against all liability to third parties arising out of or in connection with the terms and conditions of this Agreement or the services provided hereunder or otherwise pursuant to your instructions. This provision survives the termination of this Service and/or Agreement.

©2004 Wachovia Corporation;
Wachovia Bank, National Association;
Wachovia Bank of Delaware, National Association, Members FDIC.
Wachovia is a registered trademark of Wachovia Corporation.

EQUAL HOUSING
LENDER

E
08-725
JDB

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

**I (a) PLAINTIFFS** DF-VIMARC CORPORATION FORMERLY KNOWN AS DF CORPORATION

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **11001**
(EXCEPT IN U.S. PLAINTIFF CASES)
11001

**DEFENDANTS** WACHOVIA BANK, N.A.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **88888**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE T

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
McLeod, Watkinson & Miller
One Massachusetts Avenue N.W.
Washington DC 20001

Case: 1:08-cv-00725
Assigned To : Bates, John D.
Assign. Date : 4/28/2008
Description: General Civil

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENS
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ☐ A. Antitrust | ☐ B. Personal Injury/ Malpractice | ☐ C. Administrative Agency Review | ☐ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>Social Security:<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>Other Statutes<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

## ☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☒ 430 Banks & Banking
☒ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

1

| □ G. *Habeas Corpus/ 2255* | □ H. *Employment Discrimination* | □ I. *FOIA/PRIVACY ACT* | □ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ K. *Labor/ERISA (non-employment)* | □ L. *Other Civil Rights (non-employment)* | □ M. *Contract* | □ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| ☒ 1 Original Proceeding | □ 2 Removed from State Court | □ 3 Remanded from Appellate Court | □ 4 Reinstated or Reopened | □ 5 Transferred from another district (specify) | □ Multi district Litigation | □ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Violation of D.C. Code § 28:4-401(a) and District of Columbia Consumer Protection Procedures Act,
D.C. Code § 28-3901 et seq; breach of contract; negligence; breach of fiduciary duty.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS<br>□  ACTION UNDER F.R.C.P. 23 | **DEMAND $**<br>$231,122.55 | Check YES only if demanded in complaint<br>**JURY DEMAND:** ☒ YES   □ NO |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | □ YES   □ NO | If yes, please complete related case form. |
|---|---|---|---|

DATE 4/28/08     SIGNATURE OF ATTORNEY OF RECORD

28

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.